*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2361**

State of Minnesota,
Respondent,

vs.

Jonathan Lawrence Markle,
Appellant

**Filed November 3, 2014
Affirmed
Worke, Judge
Concurring specially, Cleary, Chief Judge**

Hennepin County District Court
File No. 27-CR-13-4020

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Paul Engh, Minneapolis, Minnesota; and

Joseph S. Friedberg, Minneapolis, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Cleary, Chief Judge; and Reyes, Judge.

## U N P U B L I S H E D   O P I N I O N

**WORKE**, Judge

Appellant argues that the district court erred in denying his motion to suppress the results of a post-accident blood test, because no exigent circumstance existed which would provide an exception to the Fourth Amendment's warrant requirement. We affirm.

# FACTS

On January 18, 2013, appellant Jonathan Lawrence Markle went to a restaurant on Lake Minnetonka with his wife and two young daughters. Markle consumed alcohol while there. While driving home, Markle decided to take a shortcut home across the frozen lake, though his wife cautioned against doing so. Under the bridge connecting Priest and Halsted Bays, the ice broke and the vehicle sank.

Witnesses called 911 at about 5:08 p.m. After Markle's wife and older daughter were rescued from the water, Markle remained submerged while attempting to rescue his younger infant daughter from the submerged vehicle. Rescuers arrived a few minutes later and immediately commenced efforts to rescue the infant. Among the rescuers was Hennepin County Sherriff's Deputy Adam Moore, who would initiate the investigation following rescue efforts. The infant was recovered from the water at 5:24 p.m. and rushed to the hospital. Efforts to save her failed and she died three days later.

While waiting for ambulances, Markle admitted to Orono Police Officer Kyle Russeth that he had consumed alcohol and that he was the driver of the vehicle. Officer Russeth noted that although Markle smelled of alcohol, he did not exhibit other common signs of intoxication, such as slurred speech or bloodshot eyes. Officer Russeth later relayed this information to Deputy Moore.

The ambulance carrying Markle left the scene at 5:32 p.m. and arrived at the Ridgeview Medical Center in Waconia at 5:45 p.m. The ambulance carried Markle from Hennepin County to Carver County. Deputy Moore drove to the hospital in his squad car, intending to commence his investigation. Upon arrival, Deputy Moore notified hospital staff of his presence, but he was asked to wait for doctor approval before

2

initiating contact with Markle.  Deputy Moore waited 20 to 30 minutes before receiving authorization from Markle's treating doctor at approximately 6:30 p.m.  Markle admitted to Deputy Moore that he had two beers, and that he drank the last just before leaving the restaurant.

After about five minutes transpired, Deputy Moore asked Markle to take a preliminary breath test; Markle declined.  Deputy Moore then read Markle the implied consent advisory, including the portion of the advisory regarding accidents involving death or injury, which he does not normally do.  Deputy Moore said: "Because I also have probable cause to believe you have violated the criminal vehicular homicide or injury laws, a test will be taken with or without your consent."  Markle asked to speak to his attorney, and did so for about 20 minutes.  At 6:57 p.m. Deputy Moore again asked Markle if he would take the blood test.  Markle replied, "I don't have a choice, right?" Deputy Moore said, "Correct," and the test was administered without a warrant.  The test indicated a blood alcohol content (BAC) of .13.

Markle was charged with criminal vehicular homicide.  Markle moved to suppress the blood test results, arguing that no exigency justified the warrantless search.  The district court denied Markle's motion, and the matter proceeded on stipulated facts.  *See* Minn. R. Crim. P. 26.01, subd. 4 (preserving pretrial issue for appellate review).  One of the facts stipulated was that Markle did not consent to the blood test.  He was convicted, and this appeal follows.

## D E C I S I O N

Markle argues that a warrant was required before administering the blood test because no exigent circumstance existed that would provide an exception to the Fourth

Amendment's warrant requirement. Consequently, he contends, the test results must be suppressed and his conviction reversed.

When reviewing a pretrial ruling on the suppression of evidence in which facts are not in dispute and the district court's decision is a question of law, the appellate court may independently review the facts and determine as a matter of law if suppression is required. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992).

Under the Fourth Amendment, a warrantless search is reasonable only if it falls within a recognized exception. *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013). The presence of exigent circumstances is a recognized exception to the warrant requirement. *Id*. "'[E]xigency in the drunk-driving context must be determined case by case based on the totality of the circumstances.'" *State v. Stavish*, 852 N.W.2d 906, 908 (Minn. App. 2014) (brackets omitted) (quoting *McNeely*, 133 S. Ct. at 1556). The natural dissipation of alcohol in the bloodstream, standing alone, is not an exigent circumstance. *McNeely*, 133 S. Ct. at 1561. But such dissipation is one factor considered in a determination of exigency. *Id*. One "important factor" that contributes to an exigency is "the gravity of the underlying offense for which the arrest is being made." *Stavish*, 852 N.W.2d at 909. Other relevant factors include the suspect's need for medical care, transport across county lines, and time pressure created by the need to take action within two hours of the time of driving. *Id.* at 908-09 (citing in support of time constraints Minn. Stat. § 169A.20 subd. 1(5) (2012) (stating that a person is guilty of driving while impaired (DWI) when his BAC is 0.08 or more as measured within two hours of driving)).

This court's recent opinion in *State v. Stavish* largely controls this case. In *Stavish*, emergency personnel responded to a single-vehicle accident in which one of the

4

occupants of the vehicle had died. *Id.* at 907. The driver, Stavish, needed medical care and was transported by ambulance to a hospital in a neighboring county. *Id.* A state patrol sergeant was instructed to take a blood sample and drove to the hospital where Stavish was being treated. *Id.* The sergeant noted that Stavish "smelled of alcohol and determined that there was probable cause to suspect that [Stavish] had committed criminal vehicular homicide." *Id.* Stavish moved to suppress the blood test results following *McNeely*, and the district court granted the motion. *Id.*

This court reversed. *Id.* at 909. The court concluded that an exigency existed because Stavish needed medical treatment, was transported across county lines, and because of the gravity of the underlying offense, "a probable criminal vehicular homicide charge, not merely a DWI charge." *Id.* The court noted that more than 50 minutes had passed between the time Stavish had been driving and his blood drawn, which was concerning given Minnesota statutory timeframes. *Id.* at 908-09.

All the aforementioned factors are present here; the delay in taking the blood draw was even longer in this case. 911 calls were placed at 5:08 p.m. Due to rescue efforts and the need for medical attention due to hypothermia, Deputy Moore did not make contact with Markle until about 90 minutes after Markle had been driving. Deputy Moore was prohibited from doing so earlier due to the need to obtain approval from Markle's treating doctor. Deputy Moore had only second-hand information about Markle prior to that time, and by the time Markle had consulted with his attorney nearly two hours had elapsed. The blood test was administered at 6:57 p.m., nearly two hours after the accident.

Such delays are important for two reasons. First, as *Stavish* recognized, the blood test evidence was "essential to a probable criminal vehicular homicide charge, not merely a DWI charge." *Id.* at 909; *see* Minn. Stat. § 609.21, subd. 1(4) (2012) (requiring BAC "of 0.08 or more, as measured within two hours of the time of driving" to support a charge of criminal vehicular homicide). Second, eight of nine justices in *McNeely* recognized that "a significant delay in testing will negatively affect the probative value of [blood test] results." 133 S. Ct. at 1561; *id.* at 1571 n.1 (Roberts, C.J., concurring in part and dissenting in part) ("When experts have worked backwards to identify a defendant's BAC at the time he was driving, defense attorneys have objected to that evidence, courts have at times rejected it, and juries may be suspicious of it.").

Certainly, the factual fit between *Stavish* and this case is not perfect. In *Stavish*, there was the possibility that Stavish could have been airlifted to another medical facility, increasing the need to take a blood test without delay. 852 N.W.2d at 907. But this divergent fact is outweighed by the similarities between *Stavish* and this case.

In concluding that *Stavish* is largely precedential here, we note that it is best practice for law enforcement to obtain a warrant whenever practicable. A determination of exigency in cases such as this is "determined case by case based on the totality of the circumstances.'" *Id.* at 908 (quoting *McNeely*, 133 S. Ct. at 1556). Uncertainty of outcomes and lengthy court proceedings may be avoided with the signed approval, prior to administration of a chemical test, of a detached, neutral magistrate. But cases of accidents, particularly those involving death or serious injury, are not routine. *See McNeely*, 133 S. Ct. at 1568 (describing the facts presented as "unquestionably a routine

6

DWI case").  This case demonstrates the need for law enforcement to be able to proceed without a warrant in appropriate circumstances.

The district court correctly concluded that the combination of factors here created an exigency, and therefore a warrant for Markle's blood test was not required.

**Affirmed.**

**CLEARY**, Chief Judge (concurring specially)

I agree with the majority that there was not enough time to obtain a warrant given the exigent circumstances found in this case, specifically the rescue efforts involving the submerged vehicle, the transport across county lines, and appellant's subsequent medical treatment. I write a concurring opinion only to express my concern that law enforcement should not be encouraged to rely on the exigent circumstances exception to administer warrantless blood tests except in limited situations, and also to express my belief that when relying on the gravity of the offense as an exigency, it is particularly critical that law enforcement also respect constitutional protections surrounding the individual who faces prosecution for that alleged grave offense.

In my view, the majority's suggestion to law enforcement that "it is best practice for law enforcement to obtain a warrant whenever practicable" is insufficient. The message to law enforcement should be that a warrant is always required under the Fourth Amendment, except in emergency situations where exigent circumstances exist. *See Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (explaining that search warrants are required for blood tests "absent an emergency," and a warrantless search is permissible "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment").

The majority emphasizes that the blood test in this case was necessary, as it was in *State v. Stavish*, as evidence related "to a probable criminal vehicular homicide charge." *State v. Stavish*, 852 N.W.2d 906, 909 (Minn. App. 2014). In doing so, the majority emphasizes the gravity of the offense as an exigency in this case, and in doing so

suggests that consequently a suspect is entitled only to watered-down Fourth Amendment protections when the crime is a serious offense, like criminal vehicular homicide. This should not be the case. Instead, I believe that the gravity of the offense and potential punishment require, in addition, that the suspect's constitutional rights are highlighted as well. *See Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835 (1966) ("The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.").

Finally, given the advances of modern communication, it should be easier than ever for officers to coordinate and apply for a warrant remotely. *See* Minn. R. Crim. P. 36.01-.08 (permitting search warrants to be requested orally by telephone and issued remotely by judges). While obtaining a warrant was not practicable in this case, the worst message we can send law enforcement is that the failure to obtain a warrant will be overlooked as "not practicable" in most cases, particularly those cases involving alleged serious offenses. If gravity of the offense is allowed to stand alone as an exigency, or is overemphasized as an exigency, warrants will not be obtained when they are most needed, for I agree with the majority that "[u]ncertainty of outcomes and lengthy court proceedings may be avoided with the signed approval . . . of a detached, neutral magistrate."