PD-0077-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/4/2015 5:23:00 PM
Accepted 3/6/2015 2:48:48 PM
ABEL ACOSTA
CLERK

PD-0077-15

## TO THE COURT OF CRIMINAL APPEALS OF TEXAS

## OF THE STATE OF TEXAS

STEVEN COLE                                    APPELLANT

V.

THE STATE OF TEXAS                             APPELLEE

Appeal from Gregg County
124th District Court No. 41,312-A

\* \* \* \* \* \* \* \*

No. 06-13-00179-CR
Sixth Court of Appeals
2014 Tex.App.LEXIS 13498, 2014 WL 7183859

\* \* \* \* \* \* \* \*

## REPLY TO STATE'S PETITION FOR DISCRETIONARY REVIEW

\* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

March 6, 2015

ABEL ACOSTA, CLERK

EBB B. MOBLEY
State Bar # 14238000
Attorney at Law
422 North Center Street-Lower Level
P. O. Box 2309
Longview, TX   75606
Telephone: 903-757-3331
Facsimile: 903-753-8289
ebbmob@aol.com

ATTORNEY FOR APPELLANT

## REPLY TO QUESTIONS ONE AND TWO

The first two questions propounded by the State ask whether the implied consent and mandatory blood draw provisions of the Transportation Code provide an exception to the requirement for a search warrant. This issue has been answered by this Court in the negative in *State v. Villarreal*, PD-0306-14 (Tex.Crim.App. November 26, 2014, pet. reh. granted).

## REPLY TO QUESTION THREE

In *State v. Villarreal*, PD-0306-14, this Court held the Transportation Code does not create an exception to the warrant requirement to permit a warrantless taking of blood. The State offers no new arguments in its petition in this case to distinguish it from *Villarreal*. Respondent would contend this Court correctly decided *Villarreal* in light of *Missouri v. McNeely*, 133 S.Ct. 1552 (2013).

## REPLY TO QUESTION FOUR

The concurring opinion in the case below at pp. 22-26 discusses in detail the proposition that the Texas Court of Criminal Appeals has previously rejected an effort to broaden the [Texas] good-faith exception using federal precedent . . . *Douds*, 434 S.W.3d at 861-62 (citing *Howard v. State*, 617 S.W.2d 191, 193 (Tex.Crim.App. 1979) (op. on reh'g) (declining to apply federal good-faith doctrine to Texas statutory good-faith exception). Since "the Texas good faith exception is more limited than the scope of its federal counterpart . . . an officer's good faith reliance on the law or existing precedent is not recognized as an exception to the Texas exclusionary rule." *State v. Jackson*, 435 S.W.3d 819, 831 (Tex.App. - Eastland 2014, pet. granted) (citations omitted).

PD-0077-15

STATE OF TEXAS V. STEVEN COLE

APPENDIX TO APPELLANT'S REPLY TO
STATE'S PETITION FOR DISCRETIONARY REVIEW

4 RR 6-28



Welcome back, ladies and gentlemen.  We're ready to continue with trial at this time.

Ms. Brownlee, you may call your next witness.

MS. HOOD:  The State calls Justin Schwane.

THE COURT:  Justin Schwane.

*(Witness enters courtroom)*

THE COURT:  Sir, if you'll raise your right hand and receive the oath from the Clerk.

*(The oath was administered by the Clerk)*

THE COURT:  Just have a seat right there in the jury box [sic] and speak directly into the microphone.

You may proceed.

**JUSTIN SCHWANE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

*BY MS. HOOD:*

Q.  Good morning.  Can you state your name for the record?

A.  Justin Schwane, S-C-H-W-A-N-E.

Q.  And how are you presently employed?

A.  As a toxicology chemist at Dallas County Southwestern Institute of Forensic Sciences.

Q.  And what is a toxicologist?

A.  A toxicologist is someone who studies toxins in the human body.  A forensic toxicologist is -- has an

application to drug analysis, law enforcement and criminal investigation.

Q. And how long have you been employed with SWIFS?

A. Over 10 years.

Q. And that's the abbreviation for --

A. SWIFS, yes. S-W-I-F-S.

Q. And at the time of testing, was your lab accredited by the Texas Department of Public Safety?

A. Yes.

Q. December 1st, 2011, into January 30th, 2012?

A. Yes.

Q. What are your duties at SWIFS?

A. There was the analytical services, records management, overall laboratory management, instrument maintenance, method development. There's the evidence management.

Q. And have you ever testified before?

A. I have.

Q. Few or many --

A. Many occasions.

Q. Many. And have you ever tested blood for the purpose of determining if drugs or alcohol are in the blood?

A. Yes, I have.

Q. And would you say how many times, guesstimate --

A. Many.

Q. Many; hundreds, thousands?

A. Depending on the analysis, yes, thousands possibly.

Q. And can you tell us a little bit about your educational background?

A. My highest level of education is a master's in chemistry from the University of Oklahoma in Norman; also a bachelor's in chemistry from Southwestern Oklahoma State University in Weatherford, Oklahoma. I have completed our facility's in-house training, some continuing education courses. I belong to a professional organization, attend scientific meetings annually, if I'm capable.

Q. And on January 30th, 2012, were you employed as a toxicologist by SWIFS?

A. Yes, I was.

Q. Did you have an occasion to collect a sample of blood from the SWIFS property room that was identified as Steven Cole's?

A. I believe that I did take possession of some blood for this case from our toxicology evidence storage area.

Q. When did you receive the blood?

A. I'd have to check my records.

Q. Okay. That's fine.

A. My records show that our facility received it on the 4th of January, 2012.

Q. Okay. And when was it tested?

A.   The testing was anywhere from the 9th of January through the 26th of January.

Q.   Okay.   We'll get to that in just a second.

I'm showing you what's been marked -- actually it's already been admitted, excuse me, as State's Exhibit 11.   Can you identify this?

A.   Yes.

Q.   You can -- how can you identify that?

A.   There's -- our laboratory's unique identifier barcode label is -- is on here.

Q.   And does that have a certain number?

A.   Yes.   IFS-12-00228.

Q.   And does that number match your records number?

A.   Yes.

Q.   And it's the same number?

A.   Yes, ma'am.

Q.   Okay.   When you received the blood, was it -- the box, was it tampered with in any way?

A.   Again, to check the chain of custody, it was received in a sealed condition.

Q.   Okay.   And now I'm going to -- if you could open this for us?

A.   (Witness complies).

Q.   And this has previously been admitted also.   This is State's Exhibit 12.   Do you recognize this?

A.   Yes.

Q.   How do you recognize that?

A.   It's a gray-top blood vial, and again it also has our laboratory's unique item identifier barcode label on it.

Q.   And does the barcode match your numbers and in your records?

A.   Yes, it does.

Q.   When you received this vial, was it sealed?

A.   The vial itself I do not know, but it was sealed within the cardboard box.

Q.   Yes.  That's -- that's what I meant, sealed within the box.  And did you open it, open the box?  How does that normally work when you receive --

A.   We have a centralized evidence registration area. The evidence registration would have been carried out by our evidence registrars.  The blood vial itself would have been put into one of our toxicology lab storage refrigerator areas specific for DWI casework.  And at that time it would have been ready for analysis to be performed on it.  So I would have actually taken possession of the gray-top blood vial itself.

Q.   And State's Exhibit 12, is this -- this handwriting here, is that -- is that yours; the actual numbers there? Not the handwriting there.  Are those your numbers?

A.   Well, the printed barcode label?

Q. Yes. Is there any other writing on there that's yours?

A. Specifically me, no.

Q. From your -- from SWIFS?

A. No. That is -- no, not on this. I believe that the evidence seal on the cardboard box does have one of our evidence registrar's initials on it.

Q. Okay. Thank you. Can you walk us through the start of your procedure from when you received the blood?

A. Once the blood is received, it will be -- the evidence registration process will begin, where the paperwork will be compared to the items of evidence received. It will be opened. Each case will be given its own unique identifier. All of the items of evidence within that case will then be given subsequent sequential case numbers underneath that case. It will be logged into our computer system. The appropriate analysis request will be made in the software, will be transferred from the registrar into our toxicology evidence storage area.

And at that time it is then available for the analysis -- analysis to be performed. And, using the software, we can determine which cases, which specific case numbers, need specific analysis. And so using the software, I was able to, you know, pull the case number and go get the evidence and start performing analysis on the blood evidence

that was submitted.

Q. And is this normal procedure?

A. Yes, it is.

Q. What scientific process did you use to make a determination if drugs were present in the blood?

A. The instrumentation that we employ most in our laboratory is called gas chromatography.

Q. And was that machine or that -- was the machine working properly?

A. It -- it was.

Q. And you followed normal procedure?

A. Yes, ma'am.

Q. In the course of your training and experience, have you learned about physical effects of methamphetamine on the human body?

A. I have read information and been instructed on its effects in various courses and review articles that I've read.

Q. Can you give us some examples of those?

A. Very low-dose concentrations of methamphetamine, the effects can be very mild and intoxication almost nonexistent, all the way to the extreme of binge use where there can be violence and extreme paranoia and what appears to be psychosis.

In between, there is appetite suppression,

removal of fatigue symptoms. There's euphoric effect. There --

Q. And what is the euphoric effect?

A. That is -- the feel-good high aspect of a drug is generally referred to as "euphoria" and "euphoric effect." And also a heightened -- there can be a heightened self-opinion, an increased self-esteem from the drug. The downside, there can be feelings of anxiety and stress. Apparently there can be some introspective thoughts, you know, regarding, you know, one's actions; how you've been, how you've acted, which can be distracting in terms of concentrating on divided attention tasks. And again, extreme cases, there can be the psychosis and paranoia.

Q. Let me back up to the divided attention task. What do you mean by those? Just simple examples of --

A. Very common divided attention task is operating a motor vehicle, where you're having to do multiple things at once; pay attention to the roadway in front of you, mirrors behind -- your side-view, rear-view mirrors, the cars behind you, the car, perhaps individuals on a sidewalk, if you're driving through town, stoplights, stop signs. All of these different components of operating a motor vehicle are divided attention tasks.

Q. So not being able to stop at a red light or failure to go through an intersection --

A.  One is distracted in terms of thinking about, you know, introspective thoughts, you know, one might not notice stop signs, pedestrians, changes in the roadway.

Q.  What about loss of memory, not know where someone -- where you are?  Could that be a possible effect of methamphetamine?

A.  Possibly.  You know, again, if one is distracted and doesn't really realize due to their thought pattern, thought process.

Q.  And is methamphetamine a stimulant or depressant?

A.  The -- on the up side of methamphetamine, it does have the stimulant effect and can reduce fatigue and prevent people from sleeping.  However, on the down side, there can be signs of what look like a depressant due to the loss of neurotransmitter --

Q.  Let me stop you right there.  When you said to -- sleeping part.

A.  Uh-huh.

Q.  Could you repeat that?  I'm sorry.

A.  Well, on the up side, the drug can reduce one's desire to sleep; however, when one is coming down from the drug, especially after what is called "binge use," several days of using methamphetamine, people can sleep for full days, perhaps a couple of days, as their body recovers from the multiple-day use of methamphetamine.

Q. So it would be fair to say that people would take methamphetamine to stay awake?

A. That is a --

Q. Could?

A. -- a use of it, yes.

Q. How quickly does the human body absorb methamphetamine?

A. Absorption of methamphetamine is going to depend on the route of administration. Oral administration would be the slowest, meaning you take it by mouth. And it has to be absorbed through the intestinal tract. Faster routes of absorption include what's officially called insufflation, that's snorting methamphetamine. You can also smoke methamphetamine. And there's also the IV injection of methamphetamine, which is one of the fastest routes of administration.

Q. And can someone, after they've -- all of these different ways could have ingested meth, could they appear normal?

A. Depending on one's experience with the drug, the dosing of the drug. A -- a low dose, therapeutic dosing, yes, I believe a person could appear normal and, you know, there would be no -- could be no outward signs of intoxication at a low therapeutic dose.

Q. Okay. I'm showing you what's been marked as

State's Exhibit 13.  Do you recognize this?

A.  Yes.

Q.  And how do you recognize it?

A.  It is a copy of a report from our laboratory; in particular, our toxicology section.

Q.  And is this your report?

A.  Yes.

Q.  And how do you know?

A.  My name is on it as the Primary Analyst.

Q.  Is this the report from your analysis of Steven Cole's blood?

A.  It does have the -- our case number, the 12-00228 indicator on it.

Q.  And does -- do those numbers, this IFS number, does that match your records?

A.  It does, yes.

Q.  And is it normal to make a report when you do these analyses?

A.  At the end of the analysis, when everything is complete, yes.

MS. HOOD:  At this time the State offers State's Exhibit 11 [sic] into evidence.

(State's 13 offered)

MR. HAGAN:  Can I take the witness on voir dire for a few minutes?

THE COURT:  You may.

**VOIR DIRE EXAMINATION**

*BY MR. HAGAN:*

Q.  Good morning, sir.  My name is Rick Hagan, and, I'm sorry, what was your name again?

A.  Justin Schwane.

Q.  Mr. Schwane?

A.  Schwane.

Q.  Okay.  It's not doctor?

A.  No, it's not.

Q.  Okay.  You say that SWIFS is accredited?

A.  Yes, we are.

Q.  What was the date of its accreditation?

A.  The initial one was 2003; five years after that, 2008; and we recently went through our third accreditation back in April.

Q.  Do you have a copy of your certification with you?

A.  No, I do not.

MR. HAGAN:  Judge, we would object to his testimony and report under Code of Criminal Procedure Article 38.35(d)(2).

MS. HOOD:  Your Honor, there's no reason for Mr. Schwane to have brought that information.  That's not necessary for his testimony here.  It does not disqualify him has being an expert in this case.

THE COURT: That will go to the weight, not the admissibility of the evidence; therefore, the objection is overruled.

MR. HAGAN: Thank you, Judge.

THE COURT: You may continue. And State's Exhibit 11 is admitted into evidence.

MS. HOOD: It's 13, Your Honor. I believe I said 11, I apologize.

(State's 13 admitted)

MS. HOOD: Permission to publish?

THE COURT: You may.

**DIRECT EXAMINATION (CONTINUED)**

*BY MS. HOOD:*

Q. Are you able to see that?

A. Somewhat.

Q. Somewhat?

MR. HAGAN: Keep zooming.

Q. (By Ms. Hood) Just tell me when to stop.

A. I think I can read that from here.

Q. Okay. All right. I want to talk about your report a little bit. Were you able to quantify the drug -- the level of the drug in Mr. Cole's blood?

A. Yes. There was detectable and quantitatable amounts of some substances.

Q. Okay. And can you just kind of walk us through

what this report is for the jury?

A. At the very top is our case number, the IFS-12-00228. The submitting agency is the Longview Police Department. After that, the offense that was on the submission paperwork, the name of the defendant. The Agency Case Number refers to case number information from Longview Police Department. The Evidence Submitted is a description of what we received; that of the cardboard box. And then the blood tube evidence.

Q. And is that what we were looking at earlier, Exhibits 11 and 12?

A. Yes. Then after that is a list of the analyses and their results.

Q. And then, of course, that -- is that your signature at the bottom there?

A. Yes. It is an electronic version of my signature that the software puts on through a secure software transaction.

Q. Okay. Let's focus on where it says "Blood," and underneath the blood. What is that first "Acid/Neutral Screen"? That came up as negative.

A. Acid/Neutral Screen is -- in terms of the Acid/Neutral as well as the Alkaline, those are descriptions of the pH of the compounds. By "pH" I mean it's, you know, an acid base, acidic, or basic in its chemistry when in

Justin Schwane - July 31, 2013
Direct Examination by Ms. Hood

solution. So the drugs that are acidic and neutral, things like acetaminophen, aspirin, barbiturates, there are some anti-convulsant medications that are seen in this analysis.

Q. Specifically, I want to talk about these -- this .02 number of amphetamine and this .23 of methamphetamine?

A. Okay.

Q. What is amphetamine and methamphetamine?

A. They are compounds that are central nervous system stimulants.

Q. And to your knowledge are either of these drugs legal --

A. They --

Q. -- if you have a prescription?

A. They can be obtained by prescription.

Q. However, there are some illegal street drugs also?

A. Yes.

Q. And this level -- this .23, would you consider that a low, medium or high level --

A. It would be a --

Q. -- of meth in the human body?

A. Overall I would consider it to be a moderate/medium overall dose. If we're talking about therapeutic usage, I would consider that to be a very high therapeutic dosing of methamphetamine.

Q. That level of methamphetamine, could that possibly

be suggestive of abuse?

A.   Yes.   Just -- just because it potentially could be within the therapeutic range of methamphetamine does not mean that there could not be intoxication from this level in someone who does not take it on a daily basis as a doctor would prescribe.   If someone were to want to use it recreationally, I believe that this level could cause intoxication.

Q.   Okay.   Let me go back to the amphetamine and the methamphetamine.   The amphetamine you said was legal if you have a prescription, correct?

A.   There are formulations of amphetamine, there are also drugs that the body metabolizes into amphetamine.   And that's the intent of the drug, to slowly release amphetamine.   I've been led to believe that methamphetamine also can be prescribed and is available in tablet form.

Q.   Is that common?

A.   I -- with today's current formulations of amphetamine, I do not think that methamphetamine prescription is very common.

Q.   And you are aware that methamphetamine, if you do not have a prescription, which is not common, is against the law?

MR. HAGAN:   I'll object, Your Honor.   Calls for a witness to make an opinion beyond his expertise.

MS. HOOD: I'll withdraw that question.

THE COURT: I'll let you rephrase it.

Q. (By Ms. Hood) Can you say with 100 percent certainty that the defendant was intoxicated?

A. At this time, I -- I cannot. I was not witness to any of the actions, I do not know how the witness was acting during interview, you know, after the contact with the police officers. I do not know what any outward signs of intoxication may have been at this time, or no -- no signs. I don't know at this time.

Q. Right. You were not there --

A. Correct.

Q. We're not saying you were there. There's no way you could say with 100 percent certainty that he was intoxicated?

A. Correct.

Q. Do you have an opinion as to these levels of methamphetamine, though?

A. Again, I previously mentioned they were in terms of a therapeutic dosing; I believe that they would be at the very high end of a therapeutic range. I believe overall, in terms of other drug levels that we have seen for methamphetamine, this is a moderate dose. I do believe that in an abuse situation, this level of methamphetamine could cause intoxication, could cause one to not have normal use

of mental and physical faculties.

Q. Just to be certain, these aren't necessarily two different drugs, correct?

A. Yes, they -- they are two separate compounds that we can detect and identify separately. Sometimes we see methamphetamine without amphetamine, sometimes we see amphetamine without methamphetamine.

Q. So this is common for amphetamine to be with methamphetamine in a drug analysis result?

A. Yes, it is. Am -- when a person takes methamphetamine, in the process of metabolizing the drug, meaning the body changing it so that it can remove it from the system and minimize its effects, for methamphetamine, amphetamine is produced. So this is a common phenomenon to find amphetamine in the presence of methamphetamine.

Q. Based on your experience and training and the results of this blood test, do you have an opinion as to whether the defendant could have lost the normal use of his mental and physical faculties?

A. I believe that the potential is definitely there that there could have been intoxication and not having the normal use of mental and physical faculties.

MS. HOOD: Pass the witness.

THE COURT: Cross-examination?

MR. HAGAN: Thank you.

## CROSS-EXAMINATION

*BY MR. HAGAN:*

Q. Good morning, sir. My name is Rick Hagan. A couple of questions. And so you agree with the -- I guess you're also familiar, being in toxicology, with -- let's see -- Dr. Charles Wineky?

A. No, I don't --

Q. Winek. I'm sorry.

A. I'm not sure I'm familiar with the name. No, I'm not familiar with the name.

Q. Okay. Or with his work concerning blood levels of controlled substances?

A. No, I'm not.

Q. Okay. That's not something that you've looked at, you've heard about before? Have you seen other charts or other compilations of data from professionals in your occupation that have assembled --

A. Yeah, I -- I have seen some. I -- you know, I --

Q. And are charts like those what you're relying on when you're basing your opinion here today about this being a therapeutic level of methamphetamine?

A. There are articles I've read. There's also my experience in the laboratory and having seen various, you know, drug levels of methamphetamine, both postmortem casework as well as DWI casework.

Q. Are you also aware of studies kind of in a related field of toxicology -- we just talked about it a minute ago -- as far as fatigue, the effects of fatigue on an individual?

A. Somewhat. In terms of fatigue itself on an individual or the use of methamphetamine to remove the effects of fatigue?

Q. Kind of both.

A. I know that that is a -- that is a legitimate prescription and therapeutic reason for the administration of a stimulant, is for the reduction of fatigue. Narcolepsy.

Q. And -- are you -- you're aware of the history behind the substance methamphetamine, aren't you?

A. I think initially it found big use in World War II for soldiers that were in the field, for -- had to stay awake for long periods of time.

Q. Bomber pilots?

A. I believe that even in today's military, pilots can be prescribed low doses of stimulants for the purpose of long periods in the -- in the air.

Q. Okay. And long periods without sleep causes physical fatigue, doesn't it?

A. Yes.

Q. And mental fatigue as well?

Justin Schwane - July 31, 2013
Cross-Examination by Mr. Hagan

A. That's correct.

Q. And drugs like amphetamine and methamphetamines, ameliorate fatigue to a certain level; is that right?

A. They can.

Q. Doesn't eliminate it --

A. I mean, it -- temporarily during the drug's administration the fatigue symptoms can be severely minimized under, you know, therapeutic dosing.

Q. Okay. So if you have an individual who has not slept or slept solidly for over a 24-hour period, okay, based upon your experience and knowledge, that person, in all likelihood, would be -- display signs of fatigue. Do you agree with that?

A. If someone hasn't slept in 24 hours, yes, I would think that signs of fatigue could be seen.

Q. Okay. Are you aware of studies that have actually been conducted both in this country and Australia that indicate that that much of a period of time of sleep deprivation and operating a vehicle is almost equivalent to someone with a blood alcohol level of .10?

A. No, I have not seen any studies like that. No.

Q. You have not seen that?

A. No.

Q. You have seen studies on the effects of fatigue, though, haven't you?

Justin Schwane - July 31, 2013
Cross-Examination by Mr. Hagan

A. No. But, you know, it does not seem unreasonable that someone with -- not having slept in 24 hours could potentially have what would appear to be intoxication effects similar to a .1 alcohol. That -- that does not seem out of the realm of being reasonable.

Q. Okay. Same would be true for therapeutic levels of methamphetamine in someone who's been deprived of sleep?

A. So --

Q. Right?

A. I seem -- I seem to be understanding that you're suggesting that the methamphetamine is causing the sleep?

Q. No. Just the opposite. It can prevent fatigue in an individual, but it can't eliminate it. Would that be a fair thing to say?

A. I mean, not forever it would not eliminate it. But as I've previously stated, methamphetamine or other amphetamines can reduce fatigue in individuals.

Q. Okay. And so if someone were to appear disoriented, say, after a motor vehicle accident, that could be attributable to -- if that individual had been deprived of sleep or an adequate amount of sleep for an extended period of time, those type of symptoms could be consistent with fatigue as well as intoxication from methamphetamine?

A. I -- I could imagine there could be some disorientation if someone is severely fatigued.

Q. Have you ever driven for a long period of time?

A. You know, I've been on, you know, car road trips for, you know, 10-, 12-hour drives to get to a destination.

Q. Okay. And after a 10- or 12-hour drive, would you agree with me that it's difficult to stay focused, continue operating safely?

A. You know, one -- after 10 or 12 hours, one needs to maintain someone's vigilance. But, yes, it's possible that, you know, being in a car for that long can be tiring both mentally and physically.

MR. HAGAN: I pass the witness.

THE COURT: Redirect?

MS. HOOD: No further questions, Your Honor.

THE COURT: May this witness be finally excused?

MS. HOOD: Yes, Your Honor.

MR. HAGAN: I -- I think so, as long as he's available, and I don't think he's going anywhere today -- actually, just -- I'll cut that short. No, he can't be.

THE COURT: If you'll retire out to the hallway at this time.

You may call your next witness.

MS. BROWNLEE: We call Dr. John Stash.

(Witness enters courtroom)

THE COURT: Doctor, if you'll raise your