*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0195**

Randy Lee Torgeson, petitioner,
Appellant,

vs

Commissioner of Public Safety,
Respondent.

**Filed January 25, 2016
Affirmed
Connolly, Judge**

Goodhue County District Court
File No. 25-CV-14-2358

Jeffrey S. Sheridan, Sheridan & Dulas, P.A., Eagan, Minnesota (for appellant)

Lori Swanson, Attorney General, William J. Young, Joan M. Eichhorst, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Considered and decided by Cleary, Chief Judge; Connolly, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CONNOLLY**, Judge

Appellant challenges an order sustaining his driver's license revocation and plate impoundment, arguing that field sobriety tests are Fourth Amendment searches and

because the commissioner failed to get a warrant or prove a valid exception to the warrant requirement, the evidence obtained from the field sobriety tests is inadmissible, and that the district court erred in admitting the DataMaster test results when the commissioner did not establish foundation for the test because procedures necessary to ensure an accurate and reliable test were not followed.[1]

Because we find that field sobriety tests are Fourth Amendment searches that require only reasonable suspicion and because we find that the district court did not err in admitting the DataMaster test results, we affirm.

## FACTS

On September 27, 2014 appellant Randy Lee Torgeson's vehicle was reported crossing the fog line and center line and hitting the median. Upon arriving at appellant's home, a police officer observed appellant unloading a crock pot from the trunk of the vehicle. The officer, approached appellant who informed the officer that he had just arrived at home and had been driving. The officer observed that appellant's speech was slurred and that his eyes were red and watery. Appellant admitted drinking apple wine earlier in the day. The officer then had appellant perform field sobriety tests, which revealed several

---

[1] Appellant also argues that the DataMaster evidence is inadmissible because it was obtained from appellant in violation of his Fourth Amendment rights and without a warrant or an exception to the warrant requirement and that the breath test result should have been suppressed because the criminal test refusal statute is unconstitutional and therefore the implied-consent advisory read to appellant violated his conditional right to due process and the doctrine of unconstitutional conditions. Appellant recognizes that *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), *cert. granted*, 83 U.S.L.W. 3916 (U.S. Dec. 11, 2015) (No. 14-1470) precludes these arguments and raises the issues only to preserve them pending the Supreme Court's review of *Bernard*.

indicia of intoxication. The officer then performed a preliminary breath test (PBT), which measured appellant's alcohol concentration at 0.115. The officer arrested appellant for suspicion of DWI and transported him to the Public Safety Building.

There, the officer read appellant the Minnesota Implied-Consent Advisory, recorded appellant's responses on the form, gave appellant an opportunity to consult with counsel, and asked if appellant would take a breath test. Appellant agreed and a breath sample was taken by an officer who was a certified operator of the DataMaster DMT-G with fuel-cell option machine (DataMaster DMT-G). The DataMaster DMT-G worked properly and indicated no errors in the sampling process. Appellant's BAC was measured at 0.13. The fuel-cell option on the machine used by the officer had been disabled by the Bureau of Criminal Apprehension (BCA), and the police did not have a warrant to conduct the field sobriety tests, the PBT, or the DataMaster DMT-G.

## D E C I S I O N

**I.     Did the district court err by admitting the results of the field sobriety tests?**

Appellant argues for suppression of the results of the field sobriety tests on the ground that field sobriety tests are searches that must be supported by probable cause and a warrant. This court reviews questions of law de novo. *In re Collier*, 726 N.W.2d 799, 803 (Minn. 2007).

Under current Minnesota law, field sobriety tests need be supported only by reasonable, articulable suspicion that the driver is impaired. *See State, Dep't. of Pub. Safety v. Juncewski*, 308 N.W.2d 316, 321 (Minn. 1981) (holding that an officer appropriately administered field sobriety tests and a preliminary breath test because the officer had

3

reasonable, articulable suspicion that the person had been driving while impaired); *State v. Klamar*, 823 N.W.2d 687, 696 (Minn. App. 2012) (determining that an officer's observation of two indicia of intoxication constituted reasonable, articulable suspicion to justify field sobriety tests and preliminary breath testing). Appellant argues that following *Missouri v. McNeely*, 133 S. Ct. 1552 (2013) Minnesota law regarding the admissibility of field sobriety tests is now unconstitutional. We disagree.

*McNeely* dealt specifically with the application of the exigent-circumstances exception to a warrantless blood test. A blood test, "which involve[s] a compelled physical intrusion beneath [a suspect's] skin and into his veins," is subject to the Fourth Amendment warrant requirement. *McNeely*, 133 S. Ct. at 1558 (stating that the warrant requirement "applies to the type of search at issue in this case, which involved a compelled physical intrusion beneath McNeely's skin and into his veins . . . ."); *see also State v. Trahan*, 870 N.W.2d 396, 401 (Minn. App. 2015) ("A blood draw is undeniably intrusive . . . ."), *review granted* (Minn. Nov. 25, 2015). Although *McNeely* and *Trahan* clarified that probable cause is required by the Fourth Amendment as applied to blood tests, those cases do not address whether field sobriety tests are subject to the warrant requirement. Because we do not believe that *McNeely* rendered the law regarding the admissibility of field sobriety tests to be unconstitutional, we adhere to binding Minnesota precedent that requires only reasonable suspicion of drunk driving to administer field sobriety tests.

Appellant does not argue that the officer did not have reasonable, articulable suspicion that appellant had been driving while impaired at the time the officer asked appellant to perform field sobriety tests. Because the officer in this case had a reasonable,

articulable suspicion, a warrant was not required and the district court did not err by admitting appellant's field sobriety test results.

**II.    Did the district court err by admitting the breath test result where the commissioner failed to establish foundation for the test's scientific reliability?**

Appellant argues that the district court erred in admitting the result of the DataMaster DMT-G test because, with the fuel cell disabled, the scientific procedures necessary to ensure an accurate and reliable alcohol concentration test were not performed when appellant was tested. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). "A breathalyzer test reading conducted by a certified operator may be admitted into evidence if it is established that the machine was in proper working order and the chemicals in proper condition." *Bielejeski v. Comm'r of Pub. Safety*, 351 N.W.2d 664, 666 (Minn. App. 1984). "Once a prima facie showing of trustworthy administration has occurred, it is incumbent on the opponent to suggest a reason why the test was untrustworthy." *Ahrens v. Comm'r of Pub. Safety*, 396 N.W.2d 653, 655-56 (Minn. App. 1986).

> In any civil or criminal hearing or trial, the results of a breath test, when performed by a person who has been fully trained in the use of an infrared or other approved breath-testing instrument . . . are admissible in evidence without antecedent expert testimony that the infrared or other approved breath-testing instrument provides a trustworthy and reliable measure of the alcohol in the breath.

5

Minn. Stat. § 634.16 (2014). Minn. Stat. § 169A.03, subd. 11 (2014) defines "[i]nfrared or other approved breath-testing instrument" as "a breath-testing instrument that employs infrared or other technology and has been approved by the commissioner of public safety for determining alcohol concentration." Minn. R. 7502.0425, subp. 2 (2015) states "the [DataMaster DMT-G] is approved by the commissioner for the purpose of determining the alcohol concentration of a breath sample, provided that the sample is analyzed using *either the unit's infrared technology or the unit's infrared technology in conjunction with its fuel cell technology.*" (Emphasis added).

Appellant does not dispute that the officer was fully trained in the use of the DataMaster DMT-G and used the DataMaster DMT-G in order to test appellant's breath. Rather appellant argues that the record in this case establishes that the machine was not in proper working order. This argument is based on the following cross-examination of the deputy charged with administering the DataMaster DMT-G test by appellant's attorney:

> Q. All right. And, again, whenever it looks at the sample in the test chamber, the Data Master, it performs both the fuel cell, as well as the infrared analysis, correct?
> A. If it is working correctly, yes.
> . . . .
> Q. And so in order for that scientific safeguard to be working properly, again, everything needs to be up and running, both the infrared and the fuel cell, correct?
> A. Correct. And in – in theory, as they built the machine[.]

Appellant argues that, because the fuel-cell technology installed in the DataMaster DMT-G was not turned on while the deputy ran appellant's breath test, the test results are unreliable and therefore, inadmissible: "[E]vidence shows that with the fuel cell technology

6

disabled . . . the DataMaster can perform only 1/6 of the scientific analysis designed into the machine."

The district court found no evidence that the DataMaster DMT-G results are not accurate and reliable because the fuel-cell option was disabled and ruled that, rather than merely point to an alleged defect, appellant must demonstrate that the alleged defect actually affected the test results. The district court concluded that "[i]t is no more than lay speculation that the disabling of the fuel cells somehow affected the accuracy or reliability of test result or made the test result 1/6 a[s] reliable as before."

The district court did not clearly abuse its discretion in admitting the test result. Minn. Stat. § 634.16 states that an approved breath-testing instrument, as defined by Minn. Stat. § 169A.01, subd. 11, provides a trustworthy and reliable measure of the alcohol in the breath. Minn. R. 7502.0425, subp. 2, provides that the DataMaster DMT-G with Fuel Cell Option is an approved instrument for analyzing a breath sample, using either the unit's infrared technology, or the infrared technology in conjunction with the fuel-cell technology. The officer who conducted the test was a certified operator; the machine was in proper working order as defined by Minn. Stat. § 634.16; and there was no indication that the chemicals were not in the proper condition. *See Bielejeski*, 351 N.W.2d at 666 ("A breathalyzer test reading conducted by a certified operator may be admitted into evidence if it is established that the machine was in proper working order and the chemicals in proper condition."). Thus, the state satisfied its burden for an admissible breath test. It then became appellant's burden to suggest a reason the test was untrustworthy. *See Ahrens*, 396 N.W.2d at 655-56.

At trial, the only evidence relevant to the inaccuracy or unreliability of the DataMaster DMT-G was the testimony of the deputy and a copy of the PowerPoint presentation he had seen during the transition training from the Intoxilyzer 5000 to the DataMaster DMT-G. Although the deputy was trained and certified to operate the DataMaster DMT-G breath test, he was clearly not an expert in how the machine worked. In response to questioning regarding the infrared analysis performed by the DataMaster DMT-G, the deputy testified, "I'm an operator. That [question regarding infrared analysis] is way more technological tha[n] what I'm willing to testify to." Later, the deputy again requested appellant's counsel to "ask a technician" because he was merely an operator and did not feel qualified to discuss the importance of utilizing the fuel-cell option. While the deputy stated on cross-examination that, if the machine is operating correctly, both the infrared and fuel cell must be operating, he also stated "[the lack of a fuel cell result] doesn't mean the machine wasn't reading correctly." The district court rejected, as lay opinion, the deputy's testimony, which suggested that the DataMaster DMT-G operating without the fuel-cell option was not reliable and trustworthy. We conclude that the district court acted within its discretion in doing so.

Nevertheless, in all future implied-consent hearings where the foundation for results for the DataMaster DMT-G is at issue, it would be the better practice for the commissioner to call a witness who is more fully prepared and qualified to explain the operation of the machine.

Because the district court acted within its discretion in rejecting appellant's attempt to discredit the trustworthiness and reliability of the DataMaster DMT-G operating without

the fuel-cell option, we conclude that the district court did not err in admitting the breath test results from the DataMaster DMT-G breath test.

**Affirmed.**